KENTUCKY UNEMPLOYMENT
INSURANCE COMMISISON,
Appellant

v.

Lila WATTS; Jackson Enterprises/Fred
Landrum; Blackburn Griffith; and
Corbett Grigsby, Appellees.

No. 2012–CA–000911–MR.

Court of Appeals of Kentucky.

May 31, 2013.

Case Ordered Published by Court
of Appeals July 15, 2013.

Patrick B. Shirley, Frankfort, KY, for appellant.

No briefs filed for appellees.

Before DIXON, MOORE, and TAYLOR, Judges.

## OPINION

MOORE, Judge:

The Kentucky Unemployment Insurance Commission appeals from a judgment of the Breathitt Circuit Court reversing its decision to grant appellee, Lila Watts,[1] only two weeks of unemployment insurance benefits. Finding error, we reverse.

## FACTUAL AND PROCEDURAL HISTORY

■ In the context of unemployment insurance, if a worker gives his employer a two-week notice of voluntary resignation and the employer terminates the worker's employment prior to the end of that two week notice period, two periods of unemployment come into being, and each must be analyzed separately, to wit: 1) the period between the date of the worker's discharge and the effective date of the worker's resignation; and 2) the period following the effective date of the worker's resignation. As explained in *Thompson v. Kentucky Unemployment Ins. Com'n*, 85 S.W.3d 621, 626–27 (Ky. App.2002), the first of these periods is initiated by the employer and the inquiry focuses upon whether the worker was discharged for good cause; the second of these periods is initiated by the worker and the inquiry focuses upon whether the worker resigned for good cause.

Based upon this rule, the Kentucky Unemployment Insurance Commission deter-

---

1. Watts did not file a brief in this appeal.

mined that appellee, Lila Watts, was eligible for only two weeks of unemployment benefits because 1) on August 14, 2011, Watts tendered two weeks' notice to her employer, Jackson Enterprises, Inc., indicating her desire to resign from her bookkeeping and management position with that company; 2) Watts lacked good cause to resign; but 3) on August 15, 2011, Jackson Enterprises terminated Watts' remaining two weeks of employment for reasons other than misconduct.

Thereafter, Watts filed an original action in Breathitt Circuit Court to contest the Commission's determination of her benefits. In her petition, Watts argued that no evidence demonstrated that she had *ever* resigned from her employment with Jackson Enterprises:

5. The commission['s] decision says that plaintiff quit at a meeting with the employer and witnesses was not at the meeting. Plaintiff did not quit at a meeting. The employer came to work the next morning on August 15, 2011 and told her to get her personal stuff and go home. He told her the owners had discussed it and they no longer needed a manager because they were going to manage it themselves. Plaintiff was told to go sign up on unemployment. Two witnesses saw and heard this.

Watts further argued that she was entitled to more than the two weeks' worth of benefits that had been awarded to her because Jackson Enterprises had decided not to file any protest against her unemployment insurance claim.

On March 29, 2012, the circuit court affirmed the Commission's determination after noting substantial evidence of record demonstrated that Watts had indeed quit her employment with Jackson Enterprises by tendering two weeks' notice. In support, the circuit court's order extensively cited the following testimony given by Watts at an October 18, 2011 evidentiary hearing that was conducted before an administrative law judge regarding Watts' eligibility for unemployment insurance benefits:

Q: Why do you no longer work for Jackson Enterprises?

WATTS: When we had our meeting on the 14th, they kept telling me to do stuff. They didn't want to really listen to anything I said. They kept telling me to cut the workers back, not to pay any bills, and said that they had to beat me over the head to rent rooms[2] and that I hadn't done my job. That is when I gave them my notice.

Q: Okay. So you did quit?

WATTS: I didn't quit. I gave notice to quit but I had no intentions of giving the notice when I went in that evening.

Q: But you say you did give notice?

WATTS: I gave notice. I mean you can change your mind with a notice. In the heat of the moment, but it was nothing to do with any of the work or whatever, it was just some things they was [sic] saying to me and I just got up and left the meeting and I gave my notice and I reported to work at seven o'clock the next morning.

Q: Okay, so what do you mean by give notice? What did you tell them?

WATTS: I told them I gave my two weeks' notice.

---

2. In its brief, the Commission points out that the referee questioned Watts about this statement, that additional testimony given by Watts indicates that her employers were not serious about this statement and that it should not demonstrate that Watts had "good cause" for voluntarily quitting her employment. However, nothing in the record below indicates that Watts ever offered such an argument and, in light of Watts' failure to file any brief in this appeal, there is no reason for this Court to consider such an argument now.

Q: Okay, so on the 14th of August, you gave two weeks' notice?

WATTS: Yes.

\* \* \* \* \* \*

Q: Tell me what happened on the 15th when you came back to work.

WATTS: When I came in that morning at seven o'clock, I was getting my girls ready to go to work. He came in and said can I talk to you and I asked the girls to—because they usually sit in my office. That is where the time clock was. They usually sit there until time to go to work. I asked them if they would go into the other office and I shut the door and he said me and the other owners discussed it after the meeting last night and we feel like it is the best that you go on home. Get your personal stuff and leave.

Q: Did you say anything?

WATTS: I asked him and he told me to come and sign up on my unemployment. I said are you going to give me a statement saying I can get my unemployment and he said you resigned. And I said Fred [Landrum[3]], I did not resign. But I told him this is nothing—I'm not going to argue with you. And I just walked back into the other office and started getting my stuff together.

Q: You told me just a minute ago that you gave two weeks' notice but then you changed your mind. When did you tell them that you changed your mind?

WATTS: I didn't get a chance to tell them I changed my mind.

\* \* \* \* \* \*

Q: So why did you give a two week notice?

WATTS: Because what they was [sic] saying was not true.

Q: Okay, I understand that. Did you intend to quit?

WATTS: Well, if I had worked my two weeks out, I don't know.

Q: I don't know why you would give notice if you weren't planning on quitting.

WATTS: I was upset.

As an aside, much of this was the same testimony cited by the Commission in support of its own order at the administrative level. And, from this and other testimony, the Commission and the circuit court both concluded that what caused Watts to quit her employment with Jackson Enterprises was merely the fact that criticisms of her job performance had upset her. The circuit court did not address whether that would have been enough to qualify as good cause for quitting, but the Commission determined that it was not. We agree with that assessment. *See, e.g., Brownlee v. Com.,* 287 S.W.3d 661, 665 (Ky.2009) ("[T]he conditions [under which a worker quits employment] must be such that the objective, reasonable person would agree that the circumstances compel the belief that there is no reasonable alternative to leaving the job").

After initially affirming the Commission's order, the circuit court reconsidered its judgment on the basis of a motion for reconsideration filed by Watts. This motion pointed to certain answers provided by Fred Landrum on behalf of Jackson Enterprises in a document contained in the administrative record. The document, entitled "Notice of Potential Benefit Charges," had informed Jackson Enterprises of its right to protest Watts' claim

---

**3.** As noted later in this opinion, Fred Landrum was the secretary-treasurer of Jackson Enterprises.

for benefits. It further provided "If this claimant's separation from your employment was for any reason other than lack of work, please check the applicable block(s) below and return this notice to the address shown above within 15 days of this notice." The blocks in question indicated the following choices: "Voluntary Quit," "Labor Dispute (strike)," "On Vacation or Other Paid Leave," "Discharge for Misconduct," "Unable or Unavailable for Work," and "Other (specify)." In response, Landrum had checked the block next to "Other (specify)" and had written "Employees health ins was eliminated and she needed to find a job with health ins." At the bottom of this document, Landrum also added "We could not afford to continue health insurance but are not contesting benefits."

On April 23, 2012, on the basis of what Jackson Enterprises had represented in this document, the circuit court vacated its prior order and reversed the Commission's order. In relevant part, the circuit court's judgment stated:

> Based upon the [notice of potential benefit charges] document, the Court finds that the decision of the Commission and Hearing Officer is not supported by substantial evidence … Therefore the decision of the hearing office [sic] is not supported by substantial evidence and the decision of the hearing officer is overturned and; IT IS HEREBEY [sic] ORDERED and ADJUDGED that the Appellant shall be awarded unemployment benefits consistent with the application herein.

The Commission now appeals.

## STANDARD OF REVIEW

In reviewing an agency decision, the reviewing court may only overturn that decision if the agency acted arbitrarily or outside the scope of its authority; if the agency applied an incorrect rule of law; or if the decision itself is not supported by substantial evidence on the record. *Kentucky State Racing Commission v. Fuller,* 481 S.W.2d 298, 300–301 (Ky.1972). When reviewing issues of law, the court may review them *de novo* without any deference to the agency. *Mill Street Church of Christ v. Hogan,* 785 S.W.2d 263, 266 (Ky. App.1990).

On questions of fact, the court's review is limited to an inquiry of "whether the agency's decision was supported by substantial evidence or whether the decision was arbitrary or unreasonable." *Cabinet for Human Resources, Interim Office of Health Planning and Certification v. Jewish Hospital Healthcare Services, Inc.,* 932 S.W.2d 388, 390 (Ky.App.1996). Substantial evidence means "evidence of substance and relevant consequence having the fitness to induce conviction in the minds of reasonable men." *Owens–Corning Fiberglas v. Golightly,* 976 S.W.2d 409, 414 (Ky. 1998).

If there is substantial evidence in the record to support the agency's findings, the court must defer to those findings even though there is evidence to the contrary. *Kentucky Comm'n on Human Rights v. Fraser,* 625 S.W.2d 852, 856 (Ky.1981). Likewise, a court may not substitute its own judgment as to the inferences to be drawn from the evidence of record for that of the administrative agency. *Railroad Commission v. Chesapeake & Ohio Ry. Co.,* 490 S.W.2d 763, 766 (Ky.1973). If the court finds the rule of law was applied to facts supported by substantial evidence, the final order of the agency must be affirmed. *Brown Hotel Company v. Edwards,* 365 S.W.2d 299, 302 (1963). The function of the court in administrative matters "is one of review, not of reinterpretation." *Kentucky Unemployment Insur-*

*ance Commission v. King,* 657 S.W.2d 250, 251 (Ky.App.1983).

## ANALYSIS

 The circuit court's April 23, 2012 judgment could be interpreted to mean that Watts is entitled to benefits because the cancellation of her health insurance gave her "good cause" for quitting her employment with Jackson Enterprises. Or, it could be interpreted to mean that Watts is entitled to benefits because Jackson Enterprises' representations in the "notice of potential benefit charges," along with its failure to specifically identify the reason for Watts' unemployment and its decision not to contest Watts' claim for unemployment benefits, conclusively demonstrate that Watts did not resign and that she was therefore not discharged for misconduct. Under either interpretation, the Commission argues that the circuit court erred.

If the circuit court's order is given the first of the above two interpretations, we agree with the Commission. Below, Watts never raised any argument relating to the issue of her health insurance being revoked or regarding the element of "good cause" for quitting. Moreover, Watts has not filed a brief in this appeal. In any event, Watts herself testified at the administrative hearing that she *did not quit* her employment due to the cancellation of her health benefits:

> Before they told me [I hadn't done my job], they was [sic] telling me what they was [sic] going to do. They took my insurance which that wasn't an issue. I had told my sister earlier in the week that I figured my insurance would be took [sic] because business was slow and I expected that. I didn't open my mouth when they said that. That was not an issue. Yeah, I've got medical

> problems and I need insurance but I didn't say anything to them.
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> [Jackson Enterprises] did take my insurance. That was give [sic] to me as a raise years ago. I need insurance but I never did tell [Jackson Enterprises] I needed a job with insurance.

In short, the circuit court had no justification for raising the issue of "good cause" *sua sponte.* Watts' failure to file a brief in this matter qualifies as a confession of error on this point (*see* CR 76.12(8)(c)(iii)). And, even if Watts had raised this issue, no substantial evidence of record supports that the cancellation of Watts' health benefits caused Watts to resign from her employment at Jackson Enterprises.

 We also agree that the circuit court erred in reversing the Commission's decision if the circuit court's order is given the second of the above two interpretations. Jackson Enterprises' answers in the "notice of potential benefit charges" document are vague at best. Rather than drawing negative inferences from a series of unchecked blocks, the Commission was justified in relying upon additional evidence of record to determine how Watts came to be separated from her employment. This evidence properly included Watts' above-described testimony that she tendered her two weeks' notice to Jackson Enterprises; that her reason for doing so was that she had been upset by criticisms of her job performance; and that her employer understood that she had voluntarily quit. As Watts herself stated, "I said [to Fred Landrum] are you going to give me a statement saying I can get my unemployment and he said you resigned."

 No Kentucky authority stands for the proposition that if an employer fails to contest a worker's claim for unemployment benefits, the worker *must* be

awarded unemployment benefits. Such a proposition would be inconsistent with the general rule that no employer, or individual who is or was in his employ, has any prior claim or rights to the amounts paid by the employer into the unemployment trust fund. *See* KRS 341.530(1). The regulations applicable to unemployment insurance proceedings allow for summary dispositions of benefit claims only as a matter of discretion. *See, e.g.,* 787 Kentucky Administrative Regulation (KAR) 1:110 §§ 1(5)(a).[4] And, ultimately, it is the worker's burden to establish good cause for quitting employment to demonstrate

any entitlement to unemployment benefits. *Brownlee,* 287 S.W.3d at 664.

### CONCLUSION

For these reasons, the judgment of the Breathitt Circuit Court is REVERSED.

ALL CONCUR.

4. This regulation provides that "After the hearing is concluded the referee shall promptly set forth in writing his finding of facts on the issues involved, his decision and the reasons therefor; provided, however, that if the appellant fails to appear and prosecute his appeal, the referee *may* summarily affirm the determination." (Emphasis added.)